T.C. Memo. 2013-211

UNITED STATES TAX COURT

PAUL GRAFFIA, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.    4066-11, 15659-09,         Filed September 9, 2013.
               15865-09,   4044-11,
               4054-11.

        Ps organized PCSC, an S corporation, in which P-M and P-D
had ownership interests.  Ps, PCSC, and a friendly third party
executed and exchanged (and later canceled) reciprocal promissory
notes.  P-M and P-D deducted substantial flow-through losses from
PCSC's activities.  R disallowed Ps' flow-through deductions.  In
addition, R disallowed NOL deductions and other deductions not
related to PCSC, determined that P-D and P-A had unreported
income, and determined that Ps are liable for accuracy-related
penalties.

_____

        [1]Cases of the following petitioners are consolidated herewith:  Marilynne
Graffia, docket Nos. 15659-09 and 4044-11; and David M. and Amy L. Graffia,
docket Nos. 15865-09 and 4054-11.

[*2]     Held:  P-M and P-D are not entitled to deduct PCSC's losses because (1) Ps did not substantiate those losses, (2) P-M and P-D did not have sufficient basis in PCSC's stock to support deductions, since P-M's and P-D's alleged basis in PCSC's stock resulted from a series of paper transactions that largely canceled out one another and did not reflect economic outlays, and (3) P-D did not materially participate in PCSC.

     Held, further, Ps did not substantiate their entitlement to any other deductions; P-D and P-A failed to report capital gain income; and Ps are all liable for accuracy-related penalties.


Paul W. Graffia, for himself.

Marilynne Graffia, for herself.

David M. and Amy L. Graffia, for themselves.

Mariann S. Carbone and Justin D. Scheid, for respondent.


## CONTENTS

FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.    Petitioners. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    II.   Tenant Improvement Program. . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    III.  PCSC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    IV.  PCSC's attempts to exploit the Tenant Improvement Program. . . . . . 9
    V.   Royalty agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    VI.  Paul's promissory note to Thomas Olson. . . . . . . . . . . . . . . . . . . 12
    VII. The million-dollar notes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    VIII. PCSC's facilitation agreement with Olson Contractors. . . . . . . . . . 15
    IX.  PCSC's expenses and returns. . . . . . . . . . . . . . . . . . . . . . . . . . 16

**[\*3]**      A.      Royalty fee payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

           1.      Marilynne Graffia's royalty fee contributions. . . . . . . . 17
           2.      Setoff of the Paul Graffia note. . . . . . . . . . . . . . . . . . 18
           3.      Assignment agreement. . . . . . . . . . . . . . . . . . . . . . . . 20

           B.      Credit card payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     X.      Petitioners' tax returns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
     XI.      Notices of deficiency and petitions. . . . . . . . . . . . . . . . . . . . . . . . 23

OPINION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     I.      Evidentiary principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

           A.      Burden of proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
           B.      Lack of records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
           C.      Lack of testimony by David and Marilynne.. . . . . . . . . . . . . 27

           1.      Lack of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
           2.      Expectation of the Commissioner's
                    calling the witnesses.. . . . . . . . . . . . . . . . . . . . . . . . . 30

     II.      Disregarding fictitious arrangements. . . . . . . . . . . . . . . . . . . . . . . 33
     III.      Royalty fee income. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

           A.      Actual receipt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
           B.      Constructive receipt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

     IV.      Pass-through of PCSC losses. . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

           A.      PCSC's trade or business. . . . . . . . . . . . . . . . . . . . . . . . . . 43
           B.      Deductions underlying PCSC's losses. . . . . . . . . . . . . . . . . . 45

           1.      PCSC's royalty expenses. . . . . . . . . . . . . . . . . . . . . . 46
           2.      Credit card expenditures. . . . . . . . . . . . . . . . . . . . . . 48

**[*4]**  C.  Shareholders' material participation. . . . . . . . . . . . . . . . . . 49

D.  Shareholders' basis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

V.  NOL carryover deductions. . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VI.  Paul's Schedule C expenses. . . . . . . . . . . . . . . . . . . . . . . . 55

VII.  Unreported income. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

VIII.  Accuracy-related penalties. . . . . . . . . . . . . . . . . . . . . . . . 57

A.  Substantial understatement. . . . . . . . . . . . . . . . . . . . . . . . 58

B.  Negligence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

C.  Defenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, <u>Judge</u>:  The Internal Revenue Service (IRS) determined deficiencies in petitioners' Federal income tax and penalties as follows:

| Petitioners | Year | Deficiency | Sec. 6662 Penalty |
| --- | --- | --- | --- |
| David and | 2005 | $64,384 | $12,876.80 |
| Amy Graffia | 2006 | 70,680 | 14,136.00 |
| | 2007 | 44,193 | 8,838.60 |
| Marilynne Graffia | 2005 | 1,079 | 215.80 |
| | 2006 | 2,514 | 502.80 |
| | 2007 | 3,948 | 789.60 |
| Paul Graffia | 2005 | 10,807 | 2,161.40 |
| | 2006 | 12,041 | 2,408.20 |
| | 2007 | 13,823 | 2,764.60 |

[*5] Pursuant to section 6213(a),[2] David and Amy Graffia, Marilynne Graffia, and Paul Graffia have petitioned the Court for redetermination of those deficiencies. For the years in issue Marilynne and David had complete ownership of Preferred Capital Service Corp. ("PCSC"), an S corporation to which several of the issues in these cases relate. Central to this case is a circular and essentially fictitious arrangement of obligations--involving PCSC, petitioners, and a business acquaintance of theirs--that largely canceled each other out. The specific issues for decision are:[3]

1. whether Marilynne or Paul actually or constructively received royalty income from PCSC. We hold that they did not;

2. whether Paul's gross income for 2005 or 2006 includes any amount associated with PCSC's alleged cancellation of Paul's promissory note for $385,000. We hold that it does not;

3. whether Marilynne and David and Amy are entitled to deduct for 2005,

----

[2]Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code (26 U.S.C.) in effect for the tax years in issue, and all citations of Rules refer to the Tax Court Rules of Practice and Procedure.

[3]There are other computational adjustments set forth in the notices of deficiency issued to Paul and to David and Amy. Resolution of those adjustments will follow automatically from the Court's determinations with regard to the issues resolved in this opinion.

[*6] 2006, or 2007 any amount of deductions attributable to PCSC. We hold that they are not, because they failed to substantiate any deductions for PCSC, they failed to show that they had any basis in PCSC, and David and Amy did not materially participate in PCSC during the years in issue;

4. whether Marilynne or Paul established that either of them was entitled to net operating loss ("NOL") carryover deductions for taxable year 2005, 2006, or 2007. We hold that neither has;

5. whether Paul is entitled to any of the deductions and offsets that he claimed on his Schedule C, "Profit or Loss From Business", for taxable year 2005. We hold that he is not;

6. whether David and Amy failed to report $4,492 of taxable income associated with the sale of stocks or bonds for tax year 2007. We hold that they did; and

7. whether petitioners are liable for the accuracy-related penalties determined against them. We hold that they are.

FINDINGS OF FACT

Trial of these cases was held in Chicago, Illinois. Some of the facts in these cases were stipulated and are so found. At the time they filed their petitions, petitioners lived in Illinois.

**[*7]** I.      Petitioners

Paul and Marilynne Graffia are married, and for the years in issue they filed separate Federal income tax returns. David Graffia is Paul and Marilynne's son. For the years in issue David and his wife Amy filed joint Federal income tax returns.

Paul prepared his and Marilynne's tax returns for the years in issue. Although Paul has extensive experience in accounting, he is not registered or licensed as a certified public accountant in any jurisdiction. H&R Block prepared David and Amy's 2005, 2006, and 2007 joint returns.

II.      Tenant Improvement Program

Paul Graffia created the Tenant Improvement Program in 2001 and developed and modified it in the succeeding years. The purpose of the Tenant Improvement Program was to provide commercial property owners an innovative way to finance tenant improvements with capital acquired by the program promoter in exchange for program fees and an interest in the leasehold. (The details of the program are not significant to this case.)

The record contains extensive documentation of market research and legal advice Paul used to develop the Tenant Improvement Program. He hired lawyers to assure the validity of his concept and to help him prepare the documents

**[*8]** necessary to effectuate it. Petitioners persuaded us that they had a subjective intention to use the program to generate a profit; but there is insufficient evidence to show whether the program had substantial commercial value.

III.   PCSC

PCSC is an Illinois corporation created by Marilynne and David, which is engaged in the business of real estate construction and improvement financing. For the years in issue PCSC was a subchapter S corporation on the accrual method. Petitioners put on no evidence--expert or otherwise--to prove the value of PCSC at any time.

From PCSC's organization in 2001 until December 31, 2006, Marilynne and David were the sole shareholders of PCSC, with Marilynne owning 55.7% and David owning 44.3%. In 2007 David acquired 100% ownership of PCSC. Paul held himself out as a representative of PCSC (for example, as PCSC's "New Business Development Manager"), and he also prepared the Federal income tax returns for PCSC. In 2010 Thomas Olson (who is discussed in more detail below) acquired all of David's interest in PCSC.

In all three years in issue, David was employed at other companies. Employing the burden-of-proof principles discussed below, we find that David did

**[*9]** not expend as much as 100 hours per year working for PCSC in any of the years in issue or in preceding years.[4]

IV.   PCSC's attempts to exploit the Tenant Improvement Program

During the years in issue, PCSC did not have a bank account, any cash receipts or cash disbursements, or any documented book value, and did not invoice any customers for services rendered or for any other purpose.  However, the record shows numerous targeted marketing efforts by Paul, on behalf of PCSC, that attempted to generate interest in the Tenant Improvement Program.  Although these marketing efforts did not lead to the completion of any tenant improvement projects during the years in issue, Paul's work for PCSC in the years in issue laid the ground work for at least one tenant improvement project that did later come to fruition (i.e., the Market Square Project in Zion, Illinois) and for others that had the potential to do so, through the use of the Tenant Improvement Program or some other PCSC-guided financing arrangement.  The initial stages of the Market

---

[4]David did not testify at trial.  The only evidence offered to show the quantum of his activity was a purported log and supporting documents that relate to the pre-suit years 2002-04.  However, there is no evidence as to the preparation or authorship of that log, nor can we assume that the backup documents actually reflect work done by David (as opposed to work done by Paul in his name).  Trial witnesses other than Paul showed little awareness of the involvement of David in PCSC-related work, and the testimony about David's involvement with Market Square did not specify the years involved and concerned a transaction that culminated well after the years in issue.

[*10] Square Project began in 2004, and PCSC became involved with the project financing in 2008.

We therefore find that Paul Graffia was engaged, under the auspices of PCSC, in a bona fide business venture, entered into for profit.[5] However, as we now show, various of PCSC's purported contracts lacked that same bona fide character.

V.      Royalty agreements

Paul and Marilynne Graffia executed three successive agreements providing for royalties: The first had an effective date of January 1, 2002; the second had an effective date of January 1, 2005; and the third also had an effective date of January 1, 2005 (but was actually not executed before 2008). Each of those agreements purported to give PCSC rights to use the Tenant Improvement Program in exchange for royalty payments to Paul and Marilynne. Petitioners claim that the third agreement, which was executed no earlier than 2008 and was entitled "Tenant Improvement Program Franchise Agreement" (and which we refer to as "the Franchise Agreement"), was the one that was effective for the years

---

[5]The Commissioner did not contend, in the alternative, that if PCSC was a for-profit activity, any expenditures it made were "start-up expenditures" that are not immediately deductible, pursuant to section 195(a). We therefore do not address this issue.

[*11] in issue.[6]  The Franchise Agreement provides that Paul and Marilynne were due to receive royalty payments as follows:

|  | 2005 | 2006 | 2007 |
|---|---|---|---|
| Marilynne Graffia | $250,000 | $275,000 | --- |
| Paul Graffia | 135,000 | 250,000 | $125,000 |
| Total | 385,000 | 525,000 | 125,000 |

As we set out below, PCSC did not actually pay these royalties in cash but by deemed capital contributions (in Marilynne's case) and by purported forgiveness of fictitious debt (in Paul's case).  Marilynne had no material involvement in developing the program, and there was therefore no business reason for her to be entitled to royalties.  Petitioners offered no evidence--expert or otherwise--to show the value of the program or the amount of royalties that it would have warranted in an arm's-length transaction; and we find, as to both Marilynne and Paul, that the royalty agreements were fictitious, that royalties were never expected or intended to be paid, and that instead the royalties were intended

---

[6]Since the Franchise Agreement was not created before 2008, it was not actually in effect during the years in issue.  Petitioners claim that the Franchise Agreement replaced the two predecessor royalty agreements and that it more completely and accurately reflects the actual agreement between the parties that was in effect January 1, 2005.  We do not find that any of the three was a bona fide agreement, and petitioners did not persuade us that they were executed as alleged; but we find that the Franchise Agreement did comport with petitioners' desired tax outcomes.

[*12] as window dressing to add an appearance of reality to the overall

arrangement and, in Marilynne's case, to establish her apparent basis in PCSC, as

we discuss below.

VI.     Paul's promissory note to Thomas Olson

Thomas Olson is the president and sole shareholder of Olson General

Contractors, Inc., a general construction company that we refer to here as "Olson

Contractors."  Mr. Olson also owns Thomas Holdings, Inc. ("THI").  Paul has

known Mr. Olson for over 30 years and has worked with him on several joint

business ventures.

Petitioners contend that in their prior dealings Mr. Olson lent or advanced

money to Paul; but probative evidence of such loans or advances is lacking,[7] and

---

[7]The alleged prior loans and advances underlying Paul's note are unsubstantiated.  In reaching $383,404 as the total amount supposedly due on the note, the calculation sheet appended to the note adds:  $40,000 for "legal fees paid to Siegan Barbarkoff and Skadin Arps [sic] et al. as of January 1996"; $70,000 for "monies directly advanced to Paul through 1996"; $8,601 for "public storage payments"; $155,803 in interest calculated at 10% annually; and $109,000 for "[a]dditional advances to Paul and/or Marilynne in the form of taxable income not subject to interest charges from the 1st of February 1996 through the date hereof".  Apart from public storage receipts, there is no documentary evidence to support the underlying advances to Paul listed on the calculation sheet.  Even the evidence substantiating the public storage payments is problematic because it states that Mr. Olson, and not Paul, was the lessee on the storage rental agreement, so that if Mr. Olson paid these amounts he was evidently paying his own obligation, not lending or advancing anything to Paul.  Paul describes the "advances" of $70,000

(continued...)

[*13] we do not so find.  Apparently in late 2004, Paul signed an undated promissory note (which we refer to as "the Paul Graffia note") and an accompanying document entitled "Calculation of Monies Due Thomas A. Olson" ("calculation sheet").  The promissory note, which contains no due date, payment schedule, or demand date, states that "the undersigned maker [Paul Graffia] Promises to Pay to the order of Thomas A. Olson * * * the sum reflected on the attached calculation sheet of monies due".  The calculation sheet is dated December 31, 2004, and lists amounts totaling $383,400.  Paul did not make any principal or interest payments on the Paul Graffia note before it was canceled, and we find that neither Paul nor Mr. Olson intended or expected that Paul would pay the note.

Shortly after Paul executed the note to Mr. Olson in late 2004, David Graffia acquired the note from Mr. Olson in exchange for David's own $385,000 note (payable to "the bearer hereof"); and David then contributed the Paul Graffia note to PCSC as a purported capital contribution.  In early 2005, PCSC then

7(...continued)
and $109,000 as arising from situations in which Mr. Olson would make business investments and Paul would work on the investment and receive wages or "advances" from Olson's investment but agreed to pay Olson back when the ventures turned a profit (which they never did).  There is no evidence documenting the payment or the purpose of the legal fees.

**[\*14]** canceled the Paul Graffia note, purportedly to set off royalty payments that were ostensibly due to Paul for the "Tenant Improvement Program". Petitioners contend that David's $385,000 note was repaid in full; however, apart from a promissory note stamped "PAID IN FULL" there is no credible evidence that David actually repaid Mr. Olsen $385,000.[8] We find that neither David nor Mr. Olson expected that David would pay his note; and as a result, we find that neither David nor PCSC had any basis in the Paul Graffia note.

VII.   The million-dollar notes

David executed a note dated January 3, 2005, ostensibly promising to pay to Mr. Olson $1 million plus interest no later than December 31, 2010; and Mr. Olson executed a note with the same date on behalf of THI, ostensibly promising to pay to David $1 million plus interest no later than January 3, 2008. The notes were executed in purported fulfillment of an agreement entitled "Promissory Note Credit Terms of Agreement", pursuant to which THI would lend

---

[8]Our record does reflect a check from David and Amy to Mr. Olsen in the amount of $83,411.36 dated March 1, 2010. The check's memo line states "Interest". While it is possible to infer that this check may have reflected an interest payment on David's note to Mr. Olson, neither David nor Mr. Olson testified about this check. Given the importance of the issue and the absence of other proof to support a finding of genuine indebtedness, we find the lack of testimony about the check to weigh heavily against its having any probative value with regard to the genuineness of David's purported $385,000 debt.

[*15] $1 million to PCSC (through David), PCSC would cause the money "to be made payable to" THI, David would contribute Mr. Olson's note to PCSC as a capital contribution to PCSC, and David's shares of PCSC would be delivered and pledged to Mr. Olson as collateral for the supposed loan. No money ever changed hands as a result of the purported loans. Petitioners assert that David repaid $615,000 on his $1 million note, which they contend was thereafter canceled and a new note was issued for the remaining unpaid balance in the amount of $385,000. But again, petitioners offer no proof of the $615,000 partial payment except for a note stamped "PARTIALLY PAID/ BALANCE VIA RENEWAL".

We are not persuaded that either David or Mr. Olson expected or intended to honor these notes and find instead that they were window dressing to increase David's apparent basis in PCSC, as we discuss below.

VIII. PCSC's facilitation agreement with Olson Contractors

In December 2005, PCSC executed a "Facilitation Agreement" with Olson Contractors. In the Facilitation Agreement, PCSC agreed to give Olson Contractors the exclusive right to perform tenant improvement construction work for PCSC within the "Chicagoland franchise territory". In exchange for this exclusive construction right, the Facilitation Agreement purportedly obliged Olson Contractors (1) to give PCSC "most favored client-best pricing status" for the

[*16] construction work that was to be done and (2) to pay PCSC a commission totaling $1,600,000 payable out of Olson Contractors' profits from the work generated by PCSC. In addition Olson Contractors agreed to pay PCSC a $155,000 guaranteed minimum payment in 2005, which would be deductible from the $1,600,000 commission.

Petitioners put on no evidence--expert or otherwise--to show that the rights purportedly granted to Olson Contractors were worth $1.6 million or any other amount. As we explain below, the minimum payment was purportedly satisfied by a payment to Paul Graffia (which we find did not actually occur in a year in issue) and the remainder was never paid. We find that Paul (through PCSC) and Mr. Olson (through Olson Contractors) did hope to do projects that would generate profit and that they intended to share those profits to some degree, but the specific terms of the Facilitation Agreement were not intended by the parties to be binding.

IX.   PCSC's expenses and returns

IRS account transcripts for PCSC show that PCSC reported net losses of $447,693 for 2005, $491,323 for 2006, and $137,378 for 2007. These reported losses correspond to the PCSC flow-through loss deductions that were claimed by PCSC's owners--i.e., Marilynne (who claimed losses of $249,363 for 2005 and

[*17] $273,667 for 2006) and by David and Amy (who claimed losses of $198,330 for 2005, $217,656 for 2006, and $137,378 for 2007)--on Schedules E attached to their respective returns. PCSC's Forms 1120, U.S. Corporation Income Tax Returns, are not in evidence, and we cannot tell what income, if any, or deductions made up PCSC's claimed net losses. Apart from evidence of PCSC's royalty fees and credit card expenses (which we discuss below), we find no evidence to support any actual or constructive PCSC expenditures that might be deductible.

A.    Royalty fee payments

Petitioners point to the Franchise Agreement and their tax returns as evidence that PCSC incurred deductible royalty payments in the years in issue. However, there is no indication that PCSC actually made cash royalty payments to Paul or Marilynne in any of the years in issue. Instead, the following occurred:

1.    Marilynne Graffia's royalty fee contributions

In 2005 Marilynne entered into an agreement with PCSC and David entitled "Agreement to Provide Capital". The Agreement to Provide Capital states in relevant part:

> Capital contribution of Stockholder [Marilynne]: Stockholder hereby agrees to transfer, assign and contribute to the company [PCSC] the first one million dollars ($1,000,000.00) in royalty fee payments made pursuant to the * * * franchise agreement, upon their payment and

[*18]  receipt by Stockholder, as paid in capital contribution for the account of Stockholder.

In 2005 when her $250,000 royalty payment was due, PCSC did not actually make payments to Marilynne.  Instead, Marilynne reported on her 2005 Federal income tax return royalty fee income of $250,000 (almost entirely offset by PCSC's flow-through losses that she claimed, as we noted above) and PCSC credited an additional $250,000 to her capital account.  PCSC's corporate minutes reflect Marilynne's capital contribution and that PCSC's corresponding royalty fee obligation was discharged.  The same events transpired in 2006 with Marilynne's royalty fee of $275,000.   We find that her purported receipt of royalties from PCSC and her contribution of them to PCSC were fictitious means of inflating her apparent basis in PCSC to enable her to claim losses.

### 2.    Setoff of the Paul Graffia note

As for the amounts that PCSC purportedly owed Paul for royalty payments, Paul granted to PCSC (in a document entitled "Loan/Note Settlement Agreement") the right to set off his debt under the Paul Graffia note (which PCSC had acquired from Mr. Olson) against that royalty obligation.[9]  This settlement agreement

---

[9]There was a provision in the Franchise Agreement that prohibited PCSC from setting off royalty payments with other obligations; but at trial Paul testified that he waived that provision.

[*19] provides that $135,000 would be set off in 2005 and $250,000 in 2006--the total amounts of royalties supposedly due.

Paul did report those royalty amounts on Schedule E, "Supplemental Income and Loss", of his income tax returns. However, the royalty income was fictitious, and we conclude he reported it as window dressing. If PCSC claimed corresponding deductions for its supposed royalty payments to Paul, then just as they were fictitious income to Paul they were fictitious expenditures of PCSC; and any pass-through losses from PCSC that arose from those royalty deductions are unsubstantiated.

On his 2005 Schedule C, Paul reported income and claimed deductions (in much greater amounts) associated with the purported cancellation of the Paul Graffia note. That is, he reported $133,404 of "Gross receipts", i.e., arising from the purported cancellation of the Paul Graffia note, and then he deducted the following supposedly related items: $109,000 of "Returns and allowances",[10] $155,000 of "Interest - Other", $40,000 of "Legal and professional services", and $8,601 of "Rent/Lease - Other Business Property". Paul contends (without any

_____

[10]Paul contends that $109,000 due on the Paul Graffia note represented alleged advances to Paul that he included in income in the years that they were received, and therefore, he contends, they should be deductible on his 2005 return. Even if the note were genuine (we hold it was not), Paul has offered no proof that he had included $109,000 in income for prior years.

[*20] documentary corroboration) that in pre-suit years he used borrowed money to pay for the deduction items, but that he did not claim deductions for them in prior years, because deductions for the items were "suspended" until his purported debt was paid. We find that these expenses deducted on Paul's 2005 return were not paid in 2005 (and we do not reach the question whether they were paid in any pre-suit year).

### 3. Assignment agreement

Petitioners also claim that PCSC paid and that Paul received royalty payments pursuant to an agreement entered into December 2005 entitled "Assignment of Contract Payments". This agreement provided, among other things, that PCSC would assign to Paul its rights to commission payments due from Olson Contractors, which included a $155,000 guaranteed minimum payment and that amounts paid to Paul would be deemed royalty fee payments. Accordingly, Olson Contractors or Mr. Olson, himself, was supposedly to pay $155,000 directly to Paul to satisfy royalty fees that PCSC supposedly owed him. We find that no such payment took place in any of the years in issue; and we cannot tell whether PCSC reported the $155,000 amount in its income--a necessary step before it could claim its assignment as a deduction. Although both Paul and Mr. Olson testified that this payment occurred, neither indicated that the

**[\*21]** alleged payment was made during any of the years in issue; and we can find no documentary evidence to support an actual payment of $155,000 by Olson or receipt by Paul of that amount. None of Paul's returns for the years in issue (i.e., 2005, 2006, or 2007) appear to include this alleged $155,000 payment in income. We find that PCSC made no such payment.

Petitioners claim a second assignment by PCSC to Paul occurred in 2006. In July 2006 PCSC and THI entered into a "Purchase and Sale Agreement" by which PCSC purportedly sold to THI PCSC's franchise business, which entailed PCSC's interests and obligations (including alleged royalty fee obligations) in the Franchise Agreement and Facilitation Agreement. Paul claims that pursuant to the Purchase and Sale Agreement and the Assignment Agreement he received $250,000 in royalty fees. Even though Paul did report $250,000 as "Royalties received" on Schedule E of his 2006 return, we find no credible evidence to support Paul's actual receipt of this $250,000 in 2005, 2006, or 2007. Again, we cannot tell whether PCSC included in its reported income the supposed $250,000 payment from THI; and we find that it made no such payment to Paul.

B.    Credit card payments

Petitioners claim that David made capital contributions to PCSC in the amounts of $43,179.85 in 2005, $31,201.60 in 2006, and $56,891 in 2007, in the

**[*22]** form of credit card payments that David supposedly made on behalf of PCSC in payment of its expenses. Petitioners did substantiate that David incurred credit card charges in the amount claimed for 2005; but there is no evidence documenting any 2006 or 2007 credit card purchases or payments. Moreover, especially in the absence of any testimony by David, it is unclear which, if any, of these credit card expenditures actually reflect expenses of PCSC and which, if any, were actually claimed on PCSC's returns as deductible business expenses. We do not find any deductible business expenses of PCSC among David's credit card charges.

X.    Petitioners' tax returns

For the years in issue, Paul and Marilynne filed separate Federal income tax returns on Forms 1040, "U.S. Individual Income Tax Return". Paul prepared his and Marilynne's tax returns for the years in issue. On the Schedules E attached to their respective 2005 and 2006 Forms 1040, Paul and Marilynne each reported as royalty income amounts consistent with the terms of the Franchise Agreement, set out above. On his 2007 return Paul reported $159,366 of royalty income, and petitioners have not accounted for the $34,366 discrepancy between the $125,000 allegedly due under the contract and the income Paul reported. (As we have held above, Paul and Marilynne received none of these amounts.)

[*23] On his tax returns, Paul claimed NOL carryover deductions of $13,850 for 2005, $315,208 for 2006, and $231,804 for 2007. Marilynne also claimed NOL deductions of $10,280 for 2005, $20,163 for 2006, and $28,900 for 2007. Paul and Marilynne each attached, to their separate tax returns, individual schedules calculating their respective NOL carryovers for 2005, 2006, and 2007, which show that the claimed losses originated in 2000 and 2003. However, their returns for 2000 and 2003 are not in our record; and, more important, there is no evidence before us to substantiate Paul's or Marilynne's prior-year losses that would have given rise to NOL deductions for either of them.

For the years in issue David and his wife Amy filed joint Federal income tax returns. H&R Block prepared David and Amy's 2005, 2006, and 2007 joint returns. On their return for 2007, they reported $4,265 of capital gain on line 13.

XI.   Notices of deficiency and petitions

On November 22, 2010, the IRS issued a notice of deficiency to Paul for his 2005, 2006, and 2007 tax years. In that notice the IRS determined that Paul did not have any royalty income for any of the years in issue, that Paul did not have gross receipts of $133,404 arising from the cancellation of the Paul Graffia note, which he reported on his 2005 Schedule C, and that he was not entitled to any offsets or deductions that he claimed on his 2005 Schedule C. The IRS also

**[\*24]** determined that Paul was not entitled to any of the NOL deductions that he claimed and that he is liable for section 6662(a) accuracy-related penalties for 2005, 2006, and 2007.

The IRS issued to Marilynne two notices of deficiency, one on April 1, 2009, for her 2005 tax year, and a second on November 23, 2010, for her 2006 and 2007 tax years. In those notices the IRS determined that Marilynne did not have royalty income of $250,000 for 2005 and $274,562 for 2006, and that she was not entitled to claim deductions for any PCSC flow-through losses. The IRS also determined that for 2005, 2006, and 2007 Marilynne was not entitled to claim any NOL deductions and is liable for section 6662(a) accuracy-related penalties.

The IRS issued to David and Amy notices of deficiency dated April 1, 2009, for tax year 2005 and dated November 18, 2010, for tax years 2006 and 2007, in which the IRS determined that David and Amy were not entitled to deduct any PCSC flow-through losses. In addition, the IRS determined that David and Amy received a total of $8,757 in capital gains (i.e., not only the $4,265 they reported) and thus failed to report $4,492 in capital gain income from the sale of stock in

[*25] 2007.[11]  The IRS determined that David and Amy are liable for section

6662(a) accuracy-related penalties for 2005, 2006, and 2007.

Petitioners each timely filed petitions seeking redetermination of the

deficiencies determined in their respective notices of deficiency.  These cases have

been consolidated for purposes of trial.

## OPINION

### I.     Evidentiary principles

#### A.     Burden of proof

Generally, the Commissioner's determinations set forth in a notice of

deficiency are presumed correct, and the taxpayer bears the burden of proving the

determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111,

115 (1933).  Moreover, deductions are a matter of legislative grace, and the

taxpayer bears the burden of proving that he is entitled to any deduction claimed.

INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

---

[11]The notice of deficiency states:  "It is determined that your net capital gains are $8,757.00 for taxable year 2007, as computed in schedule attached, rather than $4,265.00 as reported on your income tax return for 2007."  The schedule attached to the notice of deficiency reflected an entry of $4,265 (the same amount reported on line 13 of David and Amy's tax return) as long-term capital gain and an additional entry of $4,492 as short-term capital gain.

[*26] B.    Lack of records

Section 6001 requires that–

> Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe. * * * [Emphasis added.]

Taxpayers are thus required to keep sufficient records to substantiate their gross income, deductions, credits, and other tax attributes.  See also 26 C.F.R. sec. 1.6001-1(a), Income Tax Regs.   Taxpayers are required to retain their books and records as long as they may become material:

> (e)  Retention of records.--The books or records required by this section shall be kept at all times available for inspection by authorized internal revenue officers or employees, and shall be retained so long as the contents thereof may become material in the administration of any internal revenue law.  [Emphasis added.]

26 C.F.R. sec. 1.6001-1(e).  For many of the disputed points in these cases, petitioners lack records entirely.  The excuse that Paul offers for this gap is that (he says) their records were among articles wrongfully discarded by a storage facility.  However, Paul did not testify about the nature of the records nor how they came to be in the storage facility; and in a suit brought by Marilynne (not Paul or David) and Mr. Olson against the storage facility, an appraisal of the missing items was obtained, but the records do not appear among the listed items.

[*27] Moreover, petitioners allege that Mr. Olson had custody of the stored items because they served as collateral for Paul's alleged debts to Mr. Olson; but it is hard to see why business records would have been included among items over which petitioners ceded custody to Mr. Olson. We are not persuaded that the missing records were lost by the storage facility, nor that they were ever in that facility, nor that they ever existed.

In addition to a lack of PCSC's own accounting records (apart from a few bank statements and records for public storage payments), petitioners did not offer accounting records from Mr. Olson or any of his businesses that would have corroborated petitioners' contentions about their and PCSC's business dealings with Mr. Olson, if those contentions were correct.

C.    Lack of testimony by David and Marilynne

For much of their case, petitioners rely solely on Paul's testimony; and, in particular, David and Marilynne--who were present in court throughout the trial-- did not testify, even though deductions, losses, and transactions particular to them are at issue here. In evaluating the taxpayer's evidence, we keep in mind "[t]he rule * * * that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." See Wichita Terminal Elevator Co. v.

[*28] Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir.

1947).[12] The Commissioner aptly observes in his post-trial briefs that this

principle counts against petitioners in several of the matters in dispute.

Petitioners respond as follows:

> Petitioners were without the assistance of counsel. David and
> Marilynne were not called to testify by Petitioners because Petitioners
> fully expected Respondent to call them to testify whereupon
> Petitioners could redirect and/or cross examine saving the Court's
> time. Not having David and Marilynne testify is the result of

---

[12]This negative presumption may not arise "where the evidence is equally available to both parties"; and for this purpose testimonial evidence may be considered "available" to the Commissioner where he could subpoena the witness to testify at trial. See Jordan v. Commissioner, 134 T.C. 1, 10 (2010) (citing Kean v. Commissioner, 469 F.2d 1183, 1187 (9th Cir. 1972)). However, "The determination of the question of equal availability depends upon all the facts and circumstances bearing upon the witness's relation to the parties and not merely upon his physical presence at trial or accessability for service of a subpoena. The potential witness must be equally available both legally and practically. * * * [Where the taxpayers] had superior knowledge of the testimony that might be expected from * * * [a witness, he] * * * was not as available to the Commissioner as he was to" the taxpayers. Kean v. Commissioner, 469 F.2d at 1188. The un-called witnesses in these cases were petitioners themselves (who are relatives of the other petitioner), so that petitioners obviously had superior knowledge of the testimony that they could be expected to give (especially since this Court's Rules deliberately restrict the Commissioner's ability to depose a petitioner; see Rule 74(c)). Moreover, whereas the un-called witness in Jordan v. Commissioner, 134 T.C. at 10, "potentially could corroborate" other testimony, the witnesses not called at the trial of these cases could have given unique testimony about their own supposed transactions. The negative presumption of Wichita Terminal is appropriate here.

[*29]  ineffective legal representation resulting from Petitioners not able to avail themselves of legal counsel.

In so saying, petitioners make two distinct points:

### 1. Lack of counsel

Petitioners implicitly renew their objection to the Court's refusal to allow them a continuance in these cases to enable them to hire counsel.  However, the cases had previously been continued three times; and petitioners did have counsel who previously withdrew from the case (and who had replaced prior counsel who had also withdrawn).   We concluded that petitioners had been given sufficient opportunity to hire counsel and that a further continuance was not likely to result in their actually being represented by counsel at any trial scheduled anytime in the near future.  As we stated in our order of January 24, 2012:

> While a self-represented petitioner would often prefer to be represented by counsel, more than half of this Court's petitioners represent themselves at trial.  This Court is therefore experienced with the difficulties that such self-represented petitioners face and is accustomed to helping them acclimate themselves to the courtroom and its procedures.  Moreover, we note that Mr. Graffia is the principal spokesman for the petitioners, * * * and that his filings show him to be a literate, organized, and articulate person.  The absence of counsel is not a compelling reason to delay this case--especially where two attorneys have withdrawn because of disagreements between counsel and clients.  We see no reason to assume that a third attorney would fare any differently.  Moreover, since Mr. Graffia emphasizes his declining health, we infer that a

**[*30]** later trial may be more problematic for Mr. Graffia, not less, and we are therefore all the more disinclined to delay the trial in this case.

Petitioners' lack of counsel does not alter the burden of proof in these cases nor the appropriateness of drawing negative inferences from the silence of two of the petitioners.

> ### 2. Expectation of the Commissioner's calling the witnesses

If it is true that "Petitioners fully expected Respondent to call them to testify", then that expectation unaccountably survived the Court's warning to the contrary. At the conclusion of the first day of trial, the following exchange occurred:

THE COURT: * * * [W]e must finish this on Thursday morning.

Petitioners, we'll finish the testimony of Mr. Paul Graffia and then will Petitioners be calling themselves as witnesses. Mr. David Graffia, will you be testifying?

MR. D. GRAFFIA: I'm not sure at this point.

THE COURT: All right. Marilynne Graffia, will you be testifying?

MRS. M. GRAFFIA: I'm not sure either.

MR. P. GRAFFIA: We're not sure.

[*31]  THE COURT: All right.  Of course, the chance exists that if you do not call yourselves as witnesses that Respondent has the p[re]rogative of doing that.

MR. P. GRAFFIA: Sure.

When trial resumed and Paul concluded his testimony, petitioners stated they had no other witnesses to call.  They explained that, instead, they would be content to cross-examine David and Marilynne after the Commissioner called them as witnesses.  The Court warned them as follows:

THE COURT: All right. Let me explain a couple of risks that you face.

MR. P. GRAFFIA: Okay. Thank you, sir.

THE COURT: If you decide we won't call them and you say Petitioner rests, that means that you have put on your case and you're done. You face the risk that at that point Respondent says, Respondent rests.  And then if there was information you needed to get on through these other witnesses, you didn't put it on.  That's one risk that you face.
[Emphasis added.]

The Court then addressed "Another risk"--i.e., that petitioners' cross-examination of witnesses could not exceed the scope of the Commissioner's direct examination; but because the Commissioner then agreed that he would not assert objections about the scope of cross-examination, the Court then stated:

[*32] THE COURT: Oh, well, then that is not a risk and they will not object that your questions in cross go outside the scope of the direct. Do you understand what I'm saying?

MR. P. GRAFFIA: Yes, sir, one second please.

THE COURT: I'll be glad to explain it again.

MS. M. GRAFFIA: That's all right.

THE COURT: Okay.

MR. P. GRAFFIA: Your Honor, we will not be calling any further witnesses at this time.

Nonetheless, Paul did resume the witness stand (without objection) to substantiate

and comment on an additional exhibit, after which the Court asked--

THE COURT: * * * Do you have any other evidence that you wish to offer?

MR. P. GRAFFIA: No, Your Honor.

THE COURT: Then I'd like to hear you tell me the Petitioners rest.

MR. P. GRAFFIA: Petitioners rest, Your Honor.

THE COURT: All right, Respondent.

MS. CARBONE: Your Honor, Respondent is not going to call any witnesses. * * *

Petitioners made no response to counsel's statement that respondent would call no

witnesses. To inform the parties' posttrial briefing of the cases the Court then

**[\*33]** made preliminary observations about some of the evidence, including the

following:

> I just note that neither Mrs. Marilynne Graffia nor Mr. David Graffia testified. And all we have is rather summary testimony about their involvement from other witnesses, chiefly Mr. Graffia. We have a principle in evaluating evidence for which the case that we usually [c]ite is <u>Wichita Elevator</u> [sic] that says that where a party has the burden of proof on a point and they put on inferior evidence, not the best evidence[, t]hen we infer that if they'd put on the best evidence the facts might not have been in their favor. If the facts about Joe are important to the case and you don't put on the testimony of Joe, it makes it sound like maybe they didn't want Joe to testify because it wouldn't have been so hot. Anyway, that principle is at work in evaluating testimony, and so it's relevant to my consideration of that issue, I think.

There can be no plausible suggestion that petitioners were lulled into

expecting that the Commissioner would call David or Marilynne as witnesses, nor

that petitioners were not warned that failing to call David and Marilynne might

work against petitioners' case. Rather, petitioners made their own tactical

judgments after being explicitly warned.

II.     <u>Disregarding fictitious arrangements</u>

We have found that the critical agreements underlying petitioners'

position--i.e., the royalty agreements between PCSC and Paul and Marilynne;

Paul's $383,400 promissory note to Mr. Olson and David's $385,000 promissory

note given to Mr. Olson; and David's and Mr. Olson's reciprocal $1 million

**[\*34]** notes--were not bona fide but were shams. "[W]e define 'sham in substance' as the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Falsetti v. Commissioner, 85 T.C. 332, 347 (1985); see also Frank Lyon Co. v. United States, 435 U.S. 561, 572-573 (1978). The Court of Appeals for the Seventh Circuit (to which an appeal would be taken in this case) reviewed an instance in which "the tax court concluded that * * * transactions were shams lacking economic substance"[13] and held that the question whether a contract is a sham "is 'essentially a factual determination.'" Forseth v. Commissioner, 845 F.2d 746, 748 (7th Cir. 1988) (quoting Thompson v. Commissioner, 631 F.2d 642, 646 (9th Cir.1980), aff'g 66 T.C. 1024 (1976)), aff'g 85 T.C. 127 (1985). Petitioners failed to put on a persuasive showing that they entered into these agreements in good faith, intending to be bound by them

---

[13]Notwithstanding the reference in Forseth v. Commissioner, 845 F.2d 746, 748 (7th Cir. 1988), aff'g 85 T.C. 127 (1985), to "shams lacking in economic substance", the same court later characterized Forseth as a case in which "there are no transactions", Yosha v. Commissioner, 861 F.2d 494, 500 (7th Cir. 1988), aff'g Glass v. Commissioner, 87 T.C. 1087 (1986)--i.e., as if Forseth had involved sham in fact rather than sham in substance. However, Yosha sustained the Tax Court's finding that a transaction "really occurred but has no economic substance", characterizing it as a "finding [that] is not clearly erroneous." Id. Thus, the Court of Appeals for the Seventh Circuit evidently treats both shams in fact and shams in substance as factual issues.

**[*35]** and expecting to have to honor them. On the contrary, these agreements and the circumstances surrounding them bear indicia of being shams.

Family members and friends may enter into bona fide agreements that will be legally binding; but agreements between related parties may call for "close scrutiny" in order to assure that they ought to be respected. Bhatia v. Commissioner, T.C. Memo. 1996-429 ("close scrutiny of transactions between taxpayers and their controlled corporations"). When family members Paul, Marilynne, and David allege agreements between and among themselves and PCSC (owned by Marilynne and David) and their friend Mr. Olson, they invite such scrutiny--and cannot bear up under it. The royalty agreements, which were between PCSC (owned by David and Marilynne) and Marilynne and Paul, provided not for commissions but rather for substantial set annual fees for the use of a program that had no demonstrated profit potential, and these agreements thus reveal a pronounced "absence of arm's length dealing", Falsetti v. Commissioner, 85 T.C. at 348 (citing Estate of Franklin v. Commissioner, 64 T.C. 752 (1975), aff'd, 544 F.2d 1045 (9th Cir. 1976))--especially with regard to Marilynne, who had no role at all in the development of the program. The supposed obligations canceled each other out (i.e., Paul executes a note but it is ultimately offset by supposed royalties; David and Mr. Olson exchange $1 million notes). See Kaplan

[*36] v. Commissioner, T.C. Memo. 2005-218 ("petitioner purportedly would have owed the new corporation $800,000, which would have been exactly offset by the $800,000 that the new corporation purportedly would have owed petitioner. These circumstances further denote 'the inherent lack of substance in the loans.'" (quoting Oren v. Commissioner, T.C. Memo. 2002-172, aff'd, 357 F.3d 854 (8th Cir. 2004))). "The presence of deferred debt that is in substance or in fact not likely to be paid"--i.e., virtually all of the debts at issue here--"is an indicium of lack of, or exaggeration of, economic substance." Horn v. Commissioner, 90 T.C. 908, 938 (1988); see also Broz v. Commissioner, 137 T.C. 46, 61(2011) ("The taxpayer has not made an economic outlay, however, if the lender is a related party and if repayment of the funds is uncertain"). "[F]actors demonstrating that the debt was sham and not genuine are: no arm's-length negotiations occurred between the parties * * *; the loan did not require security, guaranty, or collateral; the note did not state when interest had to be paid; * * * [the obligor] made no payment on the loan for a significant period", Gurdin v. Commissioner, T.C. Memo. 1987-69--factors present in whole or in part with each of the debts at issue here.

As the Court of Appeals for the Seventh Circuit has explained:

[*37]     The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look behind the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. * * *

Saviano v. Commissioner, 765 F.2d 643, 654 (7th Cir.1985), aff'g 80 T.C. 955 (1983).  When we take that look behind the Graffias' papers, we find no economic reality.

III.     Royalty fee income

Cash basis taxpayers such as Paul and Marilynne must include amounts in their income when those amounts are actually or constructively received.  26 C.F.R. sec. 1.451-1(a), Income Tax Regs.; see Corliss v. Bowers, 281 U.S. 376, 378 (1930) ("income that is subject to a man's unfettered command and that he is free to enjoy at his own opinion may be taxed to him as his income, whether he sees fit to enjoy it or not").  Petitioners argue that Paul actually received some royalty payments from PCSC and that Paul and Marilynne constructively received the remainder of the royalty income from PCSC.[14]  The Commissioner responds

---

[14]Although this contention results in taxable income to petitioners, petitioners make this contention to support their position that PCSC as payor was entitled to deduct those royalty payments (and that the losses they generated were

(continued...)

[*38] that PCSC lacked the funds to make any royalty payments to Paul or Marilynne, and that they did not actually or constructively receive the royalty income. The Commissioner is correct.

A.    Actual receipt

Petitioners contend that Paul actually received royalty payments of $155,000 and $250,000 from Mr. Olson (or his companies), but they point to no cash, check, or bank transfer effectuating those payments. They argue that actual receipt happened when PCSC assigned to Paul its interests in contracts with Mr. Olson (i.e., PCSC's Facilitation Agreement with Olson Contractors and the Purchase and Sale Agreement with THI). However, as we noted above, there is no proof that PCSC included these amounts in income before deducting them as payments to Paul; there is no evidence documenting Paul's receipt of these funds; and there is no evidence that Mr. Olson made the alleged payments during the years in issue. Thus, we conclude that Paul did not actually receive $155,000 or $250,000 in royalty fees from Mr. Olson or his companies.

---

[14](...continued)
then properly passed through to Marilynne and David), and that Marilynne's contribution of royalties back to PCSC increased her basis in PCSC (and entitles her to deduct the passed-through losses). We discuss those corollary issues below.

[*39]  Petitioners also contend that Paul received $385,000 in royalty payments when PCSC canceled Paul's note in 2005 to setoff royalty payments due him for 2005 and 2006, and that this cancellation income was reported on Paul's 2005 Schedule C.

While it is possible for the setoff of a debt to result in income either as a form of a payment due or discharge of indebtedness income under section 108, see OKC Corp. v. Commissioner, 82 T.C. 638, 647-649 (1984), neither would be appropriate in this case, because we conclude for the following reasons that the note Paul executed in favor of Mr. Olson was not genuine indebtedness.

The parties contend that Mr. Olson advanced some compensation to Paul as they worked on deals together and that Paul was to repay these amounts from profits that they hoped the deals would generate.  Any such arrangement was not documented, and we are not convinced that they ever agreed to it.  Even if we credit their story, however, Mr. Olson's alleged transfers to Paul were not made at arm's length, did not comport with normal business practice, and were not treated as loans either by Mr. Olson or by Paul until well over 10 years later when they were ostensibly memorialized in the note Paul executed.  Paul did not make any principal or interest payments on the debt before it was canceled, and the debt did

[*40] not have a fixed due date.  See Frierdich v. Commissioner, 925 F.2d 180, 182-184 (7th Cir. 1991), aff'g T.C. Memo. 1989-393.

Moreover, the conditional nature of Paul's supposed obligation adds additional support to our conclusion.  An obligation is less likely to be a true debt if it will be repaid only from the profits of a business.  Zappo v. Commissioner, 81 T.C. 77, 88-89 (1983) (citing Lemery v. Commissioner, 52 T.C. 367 (1969), aff'd, 451 F.2d 173 (9th Cir. 1971)).  Mr. Olson was supposedly to be repaid when the ventures turned a profit (which they never did).  The note Paul executed in 2004 did not recharacterize the conditional obligation (which we find to be the most that the parties may have intended) into a genuine indebtedness.

Accordingly, Paul should not have included income from cancellation of the Paul Graffia note on his 2005 Schedule C.  See Hudson v. Commissioner, 103 T.C. 90, 108 (1994), aff'd, 71 F.3d 877 (5th Cir. 1995).  Petitioners make no other contentions regarding Paul or Marilynne's actual receipt of royalty payments.  Accordingly, we conclude that neither Paul nor Marilynne actually received royalty payments in cash or property.

B.    Constructive receipt

Petitioners also contend that royalty payments were constructively received by Paul and Marilynne when the payments became contractually due to them, and

**[\*41]** that constructive receipt cannot be defeated by PCSC's mere lack of ready funds, citing Sainte Claire Corp. v. Commissioner, T.C. Memo. 1997-171, aff'd without published opinion sub nom. Boccardo v. Commissioner, 164 F.3d 629 (9th Cir. 1998).

26 C.F.R. section 1.451-2(a), Income Tax Regs., describes the doctrine of constructive receipt as follows:

> Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *

Whether a taxpayer constructively received income "is essentially a question of fact." Avery v. Commissioner, 292 U.S. 210, 214 (1934); see also Willits v. Commissioner, 50 T.C. 602, 612-613 (1968). There is no constructive receipt if the payor lacks the funds to make the payments that are due. Estate of Noel v. Commissioner, 50 T.C. 702, 706-707 (1968); Wise v. Commissioner, T.C. Memo. 1997-135.

However, as petitioners contend, there may be constructive receipt of an amount due the taxpayer where a debtor, who is experiencing a lack of ready cash,

**[\*42]** has the ability to borrow the funds necessary for payment. But PCSC's financial situation is easily distinguishable from that of the obligor in Sainte Claire Corp., who had a net worth of over $50 million, had substantial income, and had a ready ability to borrow the funds necessary to satisfy his obligation. PCSC's situation, on the other hand--no bank account, no cash, no book value, and no paying customers--is more like that of the obligor in Rhombar Co. v. Commissioner, 47 T.C. 75, 85-86 (1966), aff'd, 386 F.2d 510 (2d Cir. 1967), where nonpayment of amounts due was the result of the obligor's "stringent cash position" and the unpaid amounts were, consequently, held not constructively received by the obligees.

On the evidence before us we find that PCSC did not have enough funds and was not in a position to borrow sufficient outside funds in an arm's-length transaction to satisfy its royalty obligations. On the basis of those findings we conclude that neither Paul nor Marilynne constructively received royalty fees due from PCSC. As a result, the fees are not includable in their gross income for 2005, 2006, or 2007.[15]

---

[15]The Commissioner amended his answer to include the alternative contention that, if PCSC was engaged in a trade or business for profit (as we hold it was in part III.A below), then the royalties should be taxable income to Paul and Marilynne. However, since we find that the royalties were fictitious, we do not

(continued...)

**[\*43]** IV.     Pass-through of PCSC losses

Petitioners contend that David and Marilynne in their capacity as
S corporation shareholders are entitled to deduct their respective shares of PCSC
losses for the years in issue.  See sec. 1366(a)(1).  In order to be entitled to flow-
through deductions for losses attributable to PCSC, Marilynne and David must
show:  (a) that PCSC was a business entered into for profit, (b) that the
shareholders materially participated in PCSC's activities, (c) that PCSC in fact
incurred losses, and (d) that the shareholders had bases in PCSC equal to the
amount of the losses claimed.   As we explain below, petitioners succeed in
establishing the first of these prerequisites, and Marilynne succeeds at the second,
but they fail at showing the remainder.

A.     PCSC's trade or business

A taxpayer who is carrying on a trade or business may deduct ordinary and
necessary expenses incurred in connection with the operation of the business.  Sec.
162(a).  However, a taxpayer generally may not deduct expenses incurred in
connection with a hobby or other nonprofit activity to offset taxable income from
other sources.  Sec. 183(a).  Section 183(c) defines an "activity not engaged in for

---

[15](...continued)
sustain this alternative contention.

**[\*44]** profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." An activity constitutes a "trade or business" within the meaning of section 162--and it escapes the limitation of section 183--if the taxpayer's actual and honest objective is to realize a profit. Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), aff'g in part, rev'g in part T.C. Memo. 1993-519. The expectation of profit need not have been reasonable; however, the taxpayer must have entered into the activity, or continued it, with the objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); 26 C.F.R. sec. 1.183-2(a), Income Tax Regs.[16]

The Commissioner contends that PCSC was not a business entered into for profit; therefore, deductions relating to its losses should be disallowed. Whether

---

[16]Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. At least five of these factors--i.e., numbers 1, 2, 3, 8, and 9--are plainly in petitioners' favor; and the Commissioner's contentions to the contrary focus on Marilynne and David and ignore Paul's substantial work.

[*45] petitioners through PCSC engaged in construction project financing with the requisite objective of making a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances. Lemmen v. Commissioner, 77 T.C. 1326, 1340 (1981); 26 C.F.R. sec. 1.183-2. We have found that PCSC was seriously active in real estate development and financing and had a genuine profit motive. Although Paul was not an owner of PCSC, he acted as its agent with the express authorization of PCSC's owners (Paul's wife and his son), and he and they clearly hoped and intended for PCSC to be profitable. Although PCSC was not profitable during the years in issue, Paul developed an expertise in construction financing (including tenant improvement financing), and the work that he did during the years in issue laid the groundwork for the later successful competition of Market Square Project in Zion, Illinois, and for other development projects that had a possibility of coming to fruition. The royalty agreements that purported to transfer to PCSC the rights to the Tenant Improvement Program were fictitious, but the Graffia family's collective intention to make money through PCSC was not. Accordingly, we conclude that PCSC was a business engaged in for profit.

B.    Deductions underlying PCSC's losses

In order to deduct losses passed through to them from PCSC, petitioners must establish, inter alia, that PCSC in fact incurred the claimed losses of

[*46] $447,693 in 2005, $491,323 in 2006, and $137,378 in 2007. See Burke v. Commissioner, T.C. Memo. 1995-608. Petitioners have not explained how those reported losses were calculated or indicated which PCSC deductions might account for them; and the only evidence of PCSC expenses that potentially could be deductible relates to royalty payments and credit card expenses, which we now discuss.

### 1. PCSC's royalty expenses

For three related reasons, PCSC could not properly deduct the royalty expenses underlying its claimed losses. First, petitioners simply failed to substantiate the deductions. The royalty agreements that supposedly generated the royalties were fictitious, and no royalties were in fact paid.

Second, PCSC lacked sufficient basis in the Paul Graffia note to support the deduction. PCSC deducted $385,000 as royalty expense in each of 2005 and 2006 not as the result of claiming to pay cash in that amount but rather as the supposed result of cancelling Paul's note in that amount. The royalty deductions therefore depend on PCSC's basis in Paul's note. PCSC claims that its basis in Paul's note is $385,000, because David acquired it for his own note in that amount (thus giving David a basis of $385,000 in Paul's note) and then contributed it to PCSC, which took a carryover of that basis. Since we find that both notes did not

[*47] evidence genuine indebtedness, they will not yield any basis to support PCSC's deductions. Kaplan v. Commissioner, T.C. Memo. 2005-218 (basis not increased by a "purported loan * * * [that] involved no actual economic outlay").

Third, as a timing matter, section 267 bars PCSC's deductions for the years in issue. Generally, an accrual-method taxpayer like PCSC may deduct ordinary and necessary business expenses in the tax year that all events have occurred that establish the fact of the liability, the amount of the liability is set, and economic performance has occurred with respect to the liability. 26 C.F.R. sec. 1.446-1(c)(1)(ii)(A), Income Tax Regs. However, when those business expenses are owed to a related cash-basis taxpayer, section 267(a)(2) provides that an accrual-basis taxpayer may deduct them only in the tax year that the amount involved is includable in the gross income of the cash-basis payee. Both Paul and Marilynne are related to PCSC for purposes of section 267. See sec. 267(b)(2), (c)(2), (e)(1). PCSC uses the accrual method of accounting; Paul and Marilynne use the cash method of accounting. As we concluded above, the royalty fees ostensibly due from PCSC to Paul and Marilynne were not includable in Paul's or Marilynne's gross income for 2005, 2006, or 2007. Thus, pursuant to section 267(a)(2), the royalty fees would not be deductible to PCSC for any of those years.

**[\*48]**      2.      Credit card expenditures

A taxpayer may deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business. Sec. 162(a). A taxpayer, however, must maintain records sufficient to substantiate his claimed deductions. See sec. 6001; 26 C.F.R. sec. 1.6001-1(a).

Petitioners' evidence with regard to PCSC credit card expenses incurred on David's credit card is limited to a 2005 year-end statement that is marked with handwritten notes totaling the expenditures that petitioners claim to be attributable to PCSC. The alleged PCSC expenses are commingled with hundreds of other transactions listed on the statement, some of which appear personal and others of which are evidently related to another business in which David had an interest. We have no reliable way of determining which particular credit card purchases may have been for PCSC or determining the business purpose for those particular purchases, nor even for determining the purchases for which PCSC claimed deductions. There is no evidence with regard to any 2006 or 2007 credit card purchases or payments. The substantiation here is inadequate to support section 162 business expense deductions. Accordingly, to the extent PCSC attempted to deduct amounts charged to David's credit card, those deductions are not allowed to PCSC for 2005, 2006, or 2007.

**[*49]** We can find no other evidence to support any other PCSC deductions for 2005, 2006, or 2007. Since no allowable deductions have been established for PCSC for 2005, 2006, or 2007, petitioners have failed to carry their burden to prove that PCSC incurred tax losses in any amounts for those years. Accordingly, the entirety of Marilynne's and David's deductions for their respective shares of PCSC's losses are unsubstantiated. Our analysis could end there, but we briefly address the remaining prerequisites that petitioners had the burden to satisfy.

C.     Shareholders' material participation

Section 469 generally disallows the current deduction of any "passive activity" loss. A passive activity is any trade or business in which the taxpayer does not "materially participate". Sec. 469(c)(1). Material participation is defined as involvement in the operations of the activity that is "regular", "continuous", and "substantial". Sec. 469(h)(1); 26 C.F.R. sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988). It is clear that Paul was regularly, continuously, and substantially engaged on behalf of PCSC in attempting to enter into development and financing deals during the years in issue and in preceding years. But since his wife Marilynne and his son David were the PCSC shareholders who claimed the loss deductions on their tax returns, it is their status

[*50] that matters; and the IRS contends that neither Marilynne nor David "materially participated" in PCSC.

Especially in light of the fact that neither of them testified, the record does not show a substantial quantum of PCSC activity by either of them during the years in issue. As for Marilynne, however, petitioners' principal contention[17] is that Paul's activity is properly attributed to her under 26 C.F.R. sec. 1.469-5T(f)(3), Temp. Income Tax Regs.:

> Participation of spouse. In the case of any person who is a married individual (within the meaning of section 7703) for the taxable year, any participation by such person's spouse in the activity during the taxable year (without regard to whether the spouse owns an interest in the activity and without regard to whether the spouses file a joint return for the taxable year) shall be treated, for purposes of applying section 469 and the regulations thereunder to such person, as participation by such person in the activity during the taxable year.

Paul's participation is thus treated as participation by Marilynne, and her participation was therefore material.

As for David, we have found that he maintained full-time employment outside of PCSC, and that it was Paul, not David, who performed substantially all

[17]Petitioners made this contention as early as their first pretrial memorandum filed in October 2010 and repeated it at trial (at which Paul testified that Marilynne was a "spousal activity participant") and in both of their post-trial briefs. The Commissioner has never answered or even addressed this contention or paragraph (f)(3) of the regulation.

[*51] of PCSC's activities during the years in issue. We have found that David did not expend as much as 100 hours per year working for PCSC in any of the years in issue or in preceding years. We conclude that he has not satisfied any of the standards in section 469 or 26 C.F.R section 1.469-5T(a), for material participation in PCSC; and David's deductions for losses from PCSC are disallowed for the years in issue under section 469(a), to the extent they exceed income from his passive activities.

D.    Shareholders' basis

A shareholder's initial basis in his stock corresponds to the cost of the stock plus capital contributions. Secs. 1011-1016; Pugh v. Commissioner, 213 F.3d 1324, 1330 (11th Cir. 2000), rev'g T.C. Memo. 1999-38. Neither David nor Marilynne substantiated an amount paid as the initial cost of the stock, and to establish basis both of them depend on showing subsequent contributions of capital--as to which neither of them testified. Petitioners argue that Marilynne's contribution of capital was her ostensible assignment of royalties. Likewise, petitioners argue that David's main contributions of capital were his contribution of Paul's note for $385,000 (which David acquired by trading his own equivalent note) and his exchange of his $1 million note for THI's $1 million note. However, we have found these transactions to be fictitious. Because the notes did not result

[*52] in any real change in the economic situations of the parties, the notes did not establish any basis in the PCSC stock for David or Marilynne. See Kaplan v. Commissioner, T.C. Memo. 2005-218 (basis not increased by a "purported loan * * * [that] involved no actual economic outlay").

David also contends that he made credit card expenditures on PCSC's behalf that increase his basis in PCSC. And it is true that "an outlay by a stockholder in behalf of his corporation, absent any fixed obligation for repayment, is generally regarded as a contribution to capital which should be added to the basis of his stock." Koree v. Commissioner, 40 T.C. 961, 965 (1963). However, because David failed to substantiate the business purpose of his credit card expenditures--i.e., because he failed to show that he did in fact make expenditures on PCSC's behalf--the factual predicate for his contention is simply absent. See Kaplan v. Commissioner, T.C. Memo. 2005-218 ("Petitioner bears the burden of proving that he incurred the claimed expenses, that they were paid to protect or enhance the value of his investment * * *, and that they were contributions to * * * capital").

Consequently, neither shareholder could claim any loss deductions derived from PCSC. Bertoli v. Commissioner, 103 T.C. 501, 515-516 (1994).

**[*53]** V.     NOL carryover deductions

Paul and Marilynne assert that they were each entitled to deductions for 2005, 2006, and 2007 of NOL carryovers from 2000 and 2003.  In general, a taxpayer is entitled to deduct, as an NOL for a taxable year, an amount equal to the sum of the NOL carryovers and NOL carrybacks to that year.  Sec. 172(a).  A taxpayer claiming an NOL deduction must file with his return "a concise statement setting forth the amount of the * * * [NOL] deduction claimed and all material and pertinent facts relative thereto, including a detailed schedule showing the computation of the * * * [NOL] deduction."  26 C.F.R. sec. 1.172-1(c), Income Tax Regs.  Paul and Marilynne both bear the burden of establishing the existence of NOLs in prior years and the amount that may be carried forward to the years in issue.  See Rule 142(a); Keith v. Commissioner, 115 T.C. 605, 621 (2000).  We have jurisdiction to consider such facts related to closed years that are not directly in issue, to the extent that those facts may be relevant to our redetermination of tax liabilities for the years that are before the Court.  See sec. 6214(b); Cluck v. Commissioner, 105 T.C. 324, 330 (1995).

Although both Paul and Marilynne filed with their returns schedules calculating their NOL carryovers for 2005, 2006, and 2007, these are merely statements of their claims and do not establish the correctness of the facts stated

**[\*54]** therein.  See Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979).  Neither Paul nor Marilynne offered any evidence to substantiate their alleged losses in 2000 and 2003 that gave rise to the NOL carryover deductions they presently claim for the years before us.  (They did not even offer into evidence their 2000 and 2003 returns, which might have shown, at least generally, the origin and nature of the supposed losses.)  Accordingly, they have failed to substantiate their respective NOL carryovers and are not entitled to claim any NOL deductions for the years in issue.

Petitioners argue that, because the loss-generating years are "closed years", the IRS is barred by the statute of limitations from disallowing the NOL deductions.  This argument is without merit.  If the loss-generating prior years are "closed" for purposes of the statute of limitations (section 6501), then for those years that statute bars the assessment of tax but does not bar "adjustments" or "disallowances" that eliminate the loss (and that eliminate NOL deductions in other, "open" years).  For the years in issue the period of limitation for assessments is still open (because of the IRS's issuance of the notice of deficiency and petitioners' commencement of these cases; see sec. 6503(a)(1)); and if petitioners cannot show the existence of prior-year losses that can be carried into these years, then the disallowance of the NOL deductions in these years must be

[*55] sustained, and the resulting deficiencies must be determined. Petitioners suggest that NOLs may be disallowed, notwithstanding the years' being "closed", only in a circumstance where the taxpayer seeks a refund of tax; but there is no such rule. See Cluck v. Commissioner, 105 T.C. at 330 ("the Commissioner may recompute a taxpayer's taxable income or loss for a year in which the statute of limitations would otherwise bar assessment in order to redetermine the amount of the NOL deduction claimed in an open year"); State Farming Co. v. Commissioner, 40 T.C. 774, 781-783 (1963).

VI.    Paul's Schedule C expenses

Paul contends that he is entitled to the following deductions and offsets that he claimed on a Schedule C attached to his 2005 return:

- •        $8,601 for "Rent/Lease - Other Business Property";

- •        $40,000 for "Legal and Professional Services";

- •        $155,803 for "Interest - Other"; and

- •        $109,000 for "Returns and allowances".

However, there is no evidence that in 2005 Paul paid any of the actual expenses he reported on his 2005 Schedule C. Paul argues this is because the expenses were actually paid by Mr. Olson dating back to 1996 but were suspended until Paul repaid Mr. Olson. Paul claims that the expenses were deductible to him in 2005

[*56] when PCSC discharged the Paul Graffia note (which was originally given to Mr. Olson), because the expenses were then deemed paid by Paul. Paul's argument is without merit.

First, we have already concluded that the Paul Graffia note did not evidence a genuine indebtedness, so its cancellation is a nonevent for tax purposes. Second, even if the debt was genuine, it is well settled that expenses of a cash method taxpayer are deductible in the year in which the expense is paid, even though paid with borrowed funds, and the deduction may not be postponed to the year in which repayment of the borrowed funds is made. See Crain v. Commissioner, 75 F.2d 962, 964 (8th Cir. 1935); Harris v. Commissioner, 11 T.C. 864, 867 (1948). Accordingly, Paul is not entitled to the 2005 Schedule C deductions or offsets that he claimed.

VII. Unreported income

The Commissioner contends that David and Amy had $8,757 of capital gain income in 2007 from the sale of stock or bonds but reported only $4,265 on their 2007 Federal income tax return. David and Amy did not testify on this issue, and they offered no other evidence to challenge the IRS's determination that David and Amy realized but did not report the additional $4,492 of capital gain income in 2007. In their brief, they stress that on their 2007 tax return they did report

**[\*57]** capital gain of $4,265--a fact not inconsistent with (but rather presumed in) the notice of deficiency--but they point to no evidence, testimonial or documentary, to dispute their receipt of the additional gain of $4,492. In the absence of any evidence, we cannot say that they made a showing that the determination was "without any rational foundation". Cf. Ruth v. United States, 823 F.2d 1091, 1094 (7th Cir. 1987). Accordingly, we sustain the IRS's determination on this issue.

VIII. Accuracy-related penalties

Section 6662 imposes an "accuracy-related penalty" of 20% of the portion of the underpayment of tax that is attributable to the taxpayer's negligence or disregard of rules or regulations or that is attributable to any substantial understatement of income tax. Under section 7491(c), the Commissioner bears the burden of production and must produce sufficient evidence that the imposition of the penalty is appropriate in a given case. Once the Commissioner meets this burden, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. Rule 142(a); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

**[*58]** A.    <u>Substantial understatement</u>

By definition, an understatement of income tax for an individual is substantial if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A). The notices of deficiency show that for each of the years in issue, Paul's and David and Amy's understatements will exceed both $5,000 and 10% of the tax required to be shown. Accordingly, the Commissioner has met his burden of production.

B.    <u>Negligence</u>

The notices of deficiency issued to Marilynne show that understatements of her tax is less than $5,000 in each of the years in issue; i.e., they are not "substantial understatements". However, the Commissioner asserts that Marilynne is liable for section 6662 accuracy-related penalties because her underpayments of tax were attributable to her negligence with regard to the rules or regulations. For purposes of section 6662, the term "negligence" includes a failure to exercise ordinary and reasonable care in the preparation of a tax return. 26 C.F.R. sec. 1.6662-3(b)(1), Income Tax Regs. Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. <u>Neely v. Commissioner</u>, 85 T.C. 934 (1985). The term "disregard" includes any careless, reckless, or intentional disregard of rules or regulations.

[*59] Sec. 6662(c).  It also "includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly."  26 C.F.R. sec. 1.6662-3(b)(1), Income Tax Regs.  As we noted above, taxpayers are required to retain their books and records "so long as the contents thereof may become material in the administration of any internal revenue law."  In these cases, records substantiating the alleged NOLs from 2000 and 2003 became material for the years in dispute when Marilynne deducted such NOLs on her returns.

Because the PCSC pass-through deductions that Marilynne wrongly claimed were almost exactly offset by the fictitious royalty income she reported, Marilynne's understatements are attributable almost entirely to her claimed NOL deductions generated in 2000 and 2003.  But when those 2000 and 2003 records became material to her dispute as to 2005, 2006, and 2007, she failed to keep adequate books and records and to properly substantiate those NOL deductions.  We find her negligent in this failing.

C.    Defenses

Although otherwise liable for the accuracy-related penalty, a taxpayer may avoid the liability if he successfully invokes one of three other provisions, which we briefly consider:  First, section 6662(d)(2)(B) provides that an understatement may be reduced where the taxpayer had substantial authority for his treatment of

[*60] any item giving rise to the understatement. There is no authority that would warrant Paul's, Marilynne's, or David and Amy's positions. Second, section 6662(d)(2)(B) provides that an understatement may be reduced where the relevant facts affecting the item's treatment were adequately disclosed on his tax return and the taxpayer had a reasonable basis for his treatment of that item. These criteria are not met here. Third, section 6664(c)(1) provides that, if the taxpayer shows, first, that there was reasonable cause for a portion of an underpayment and, second, that he acted in good faith with respect to that portion, then no accuracy-related penalty shall be imposed with respect to that portion. Whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including his efforts to assess his proper tax liability, his knowledge and experience, and the extent to which he relied on the advice of a tax professional. 26 C.F.R. sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners' brief argues (but Marilynne did not testify) that Paul and Marilynne "exercised diligent care in conforming their conduct and tax treatment with pertinent statutes and regulations." We cannot say that Paul or Marilynne has proved either "good faith" or "reasonable cause". They both failed to show that they kept adequate books and records to substantiate their respective NOL deductions. Nor has Paul shown adequate records to substantiate any of the other

[*61] deductions he claimed for the years in issue. Paul prepared both his and Marilynne's returns for the years in issue, but petitioners made no showing that, in so doing, Paul relied on documentation adequate to substantiate the deductions he and Marilynne claimed on their returns. Accordingly, the IRS's determinations with regard to Paul's and Marilynne's accuracy-related penalties under section 6662(a) are sustained.

Similarly, petitioners' brief argues that David and Amy "exercised diligent care in conforming their conduct and tax treatment with pertinent statutes and regulations." Even though David and Amy hired an independent tax professional to prepare their returns, we cannot say that David and Amy have shown "good faith" or "reasonable cause". David and Amy have failed to show that they kept adequate books and records or provided their return preparer with records to substantiate PCSC's deductions that flowed through to their returns. In fact, they made no showing whatsoever as to the information that they provided to their return preparer, nor as to any advice that the return preparer gave to them. Moreover, the fictitious nature of David's indebtedness to support his purported basis in PCSC is inconsistent with a taxpayer's acting in "good faith". Accordingly, the IRS's determinations with regard to David and Amy's accuracy-related penalties under section 6662(a) are sustained.

**[\*62]**  Because we have sustained in full the adjustments that the IRS made in its

notices of deficiency,

<u>Decisions will be entered for</u>

<u>respondent</u>.